**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

ANSELL GRIMM & AARON, P.C.
Anthony D'Artiglio, Esq. (117682014)
Brian J. Ashnault, Esq. (280072019)
Nicole Benis, Esq. (376152022)
Ansell Grimm & Aaron, P.C.
365 Rifle Camp Road
Woodland Park, New Jersey 07424
Tel: (973) 247-9000
E-mail: adartiglio@ansell.law
bashnault@ansell.law
nbenis@ansell.law
*Attorneys for Creditors Cory Conniff, Kavitra Kalra, Rupan Trikha, Niti Trikha, and Shetal Patel*

Hon. Eamonn O' Hagan, U.S.B.J.

In re:

Shulamit Prager,

Debtor.

Case No.: 26-14723 (EJO)

Chapter 7

In re:

Avrohom Prager (a/k/a Shaya Prager),

Debtor

Case No.: 26-14727 (EJO)

Chapter 7

Hearing Date: June 4, 2026 at 10 a.m.

**CREDITORS' OPPOSITION TO DEBTORS' (I) MOTION FOR ENTRY OF AN ORDER (A) DISMISSING THE INVOLUNTARY PETITIONS UNDER SECTION 303, AND (B) AWARDING DAMAGES UNDER SECTION 303(i) OF THE BANKRUPTCY CODE**

The above-captioned Creditors, Cory Conniff ("Cory"), Kavitra Kalra ("Kavitra"), Rupan Trikha ("Rupan"), Niti Trikha ("Niti"), and Shetal Patel ("Shetal", and collectively the "Creditors") as representatives of the Preferred Members of the Liberty 1100 VA DR Member LLC ("Liberty LLC"), Wood Ave 194 LLC ("Wood LLC") and the Riverside Richmond Member

LLC ("Riverside LLC")[1] respectfully state the following in opposition to Debtors Avrohom Prager ("Avrohom") and Shulamit Prager ("Shulamit" and together with Avrohom, the "Debtors") Motion to Dismiss the Involuntary Petitions (the "Petitions") Under Section 303, and Awarding Damages Under Section 303(i) of the Bankruptcy Code ("Motion"):

## PRELIMINARY STATEMENT

This matter concerns three real estate investments in which three syndicates of investors, the Creditors, invested $26,000,000.00. The terms of the investments were outlined specifically in operating agreements that included returns and a redemption period of their investment, which were personally guaranteed by both of the Debtors. While the full investment should have been redeemed with returns in August 2025 in the latest instance, the Creditors have not received any payments since January 2024. This has resulted in Creditors being owed over $35,000,000.00 including returns prescribed by the governing documents, which is personally guaranteed by the Debtors. During the course of litigation necessitated by the Creditors failure to recoup their investment as prescribed by personal guarantees, counsel in the underlying litigation stated on the record that these investments are "under water," which was confirmed by numerous news articles and judgments that in the aggregate amounted to ***nine figures in debt.*** Remarkably, the Debtors now seek to dismiss the Petitions despite this being precisely the instance in which involuntary bankruptcy should be applied, and the Creditors meeting all statutory requirements.

First, there is no bona fide dispute as to the liability of the Debtors, nor the amount at issue. Indeed, there is no dispute that the Debtors executed personal guarantees making them personally

[1] The Creditors are representatives of Preferred Members of the Liberty LLC, Wood LLC and Riverside LLC, the full list of Preferred Members of which are included as the plaintiffs in the underlying litigation *See* Moving Brief, **Exhibit A.**

liable, nor that the Creditors did not receive a return of their investment with returns. The only dispute as to the amount is $10,000,000.00 that the Debtors purportedly paid to one of the Creditors. Even accepting this as true – which it is not – the Creditors are due ***at the bare minimum*** $16,000,000.00 excepting the $10,000,000.00 and even the returns in the event those are disputed.

Second, it is clear that the Debtors have not generally paid their debts. This is made plain by the ***four*** judgments that were accrued in New Jersey, the numerous articles detailing the Debtors debt, and sworn statements made by Debtors' attorney. Together, along with the debt to the Creditors, this undisputable evidence conclusively demonstrates that the Debtors have not been generally paying their debts.

Third, the Petitions were filed in a good faith attempt to recover tens of millions of dollars of debt by creating a central repository for not only the Creditors' debt, but for the numerous other of Debtors' creditors -- the very purpose of an involuntary bankruptcy. As such, the Debtors' attempts to paint the Petitions as in bad faith must be cast aside especially in light of the deficient underlying reasoning. For example, the Debtors' notion that Shulamit should be released as a Debtor solely because she is a housewife notwithstanding the ***personal guarantees that she executed*** makes no logical or legal sense and must be readily dispensed. As such, there is no bona fide dispute as to liability or amount, staggering evidence that Debtors are generally not paying their debts, and a straightforward showing that the Petitions were brough in good faith rendering the Motion necessarily dismissed.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the Application pursuant to 28 U.S.C. §§ 1334 and 157. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are §§ 105(a) and 303.

## FACTS

### I. The Parties And Underlying Agreements.

Avrohom Prager ("Avrohom") and Shulamit Prager ("Shulamit", and together with Avrohom, the "Debtors") are real estate investors and operators. The Creditors entered into three separate real estate investment agreements with the Debtors wherein three subsets of the Creditors provided funding amounting to a total of $26,000,000.00. Each of the real estate projects were memorialized by operating agreements, amendments and guarantees (the "Operating Agreements") that established the members involved, the capital contributions made, the preferred return of the preferred capital contributions, the minimum returns on the capital contributions, and a redemption deadline of the capital contributions. *See* Declaration Rupan Trikha ("Trikha Decl."), **Exhibits A-C.** Specifically, the Operating Agreements including the corresponding amendments and guaranties governed the Liberty LLC, the Wood LLC and the Riverside LLC:[2]

a. The Liberty LLC: The Liberty LLC Preferred Members -- comprising of certain of the Creditors including Cory and Kavitra -- made preferred capital contributions to Liberty LLC in the amount totaling $10,500,00.00. The Liberty LLC Preferred Members are entitled to returns of 1.25% of the capital contribution per month, redemption of their capital contribution in two years that expired in August 2025, and a minimum of preferred return payment. Although the preferred return payments were initially made, no returns have been made since January 2024, and payments are due and continue to accrue, including attorneys' fees and costs. *See id.*, **Exhibit A.**

[2] The Creditors have annexed the amendments and guaranties that set out the terms relevant to this matter. As the Petitions only address the undisputed liability and amounts due pursuant the latest amendments of the Operating Agreements and corresponding guaranties, those are the documents that are being referenced herein.

b. The Riverside LLC: The Riverside LLC Preferred Members -- comprising of certain Creditors including Rupan, Niti and Shetal -- made preferred capital contributions to the Riverside LLC in the amount totaling $7,500,00.00. The Riverside LLC Preferred Members are entitled to returns of 18% annually of the capital contribution, and redemption of the capital contribution by March 8, 2024. Although the preferred return payments were initially made, no returns have been made since November 2023, and payments are due and continue to accrue, including attorneys' fees and costs. *See id.*, **Exhibit B.**

c. The Wood LLC: The Wood LLC Preferred Members -- comprising of certain Creditors including Cory, Kavitra, Rupan, Niti and Shetal -- made preferred capital contributions to Wood LLC in the amount totaling $8,000,000.00. *Id.* 50. The Wood LLC Preferred Members are entitled to returns in the amount of 1.25% of the capital contribution per month, and redemption of the capital contribution by January 30, 2025. Although the preferred return payments were initially made, no returns have been paid since November 2023, and payments are due and continue to accrue, including attorneys' fees and costs. *See id.*, **Exhibit C.**

Critically, ***both*** Avrohom and Shulamit personally guaranteed each of the Liberty LLC, Wood LLC and Riverside LLC Operating Agreements. *See id.*., **Exhibits A-C.**

## II. The Litigation.

Due to substantial funds not paid out to the Creditors pursuant to the Operating Agreements, on June 25, 2024, the Creditors filed a Complaint asserting causes of action sounding in enforcing the personal guarantees for each of the Operating Agreements in the lawsuit in the New Jersey Superior Court, Law Division captioned *Rupan Trikha, et al. v. Avrohom Prager, et al.,* Docket

No. OCN-L-1627-24 (the "Litigation"). Alleged Debtors Response and Motion to Dismiss ("Moving Brief"), **Exhibit B.**

On June 28, 2024, the Creditors filed a Motion for Summary Judgment (the "SJ Motion") seeking to enforce the guaranties corresponding with the Operating Agreements. *See* Declaration of Anthony J. D'Artiglio, Esq. ("D'Artiglio Decl."), **Exhibit A.** The Debtors' only explanation for why the owed funds had not been paid was an allegation that Dr. Lalit Patel, one of the Creditors, was paid $10,000,000.00, which encompassed the amount due at that time of $9,987,500.00. *See* D'Artiglio Decl., **Exhibit B** at 8-9. At the time of the SJ Motion, only the redemption deadline for the Riverside LLC had passed, with the Liberty LLC and Wood LLC redemption deadlines still approaching. Rupan Decl., **Exhibits A-C.** Notably, the Debtors did not dispute the $26,000,000.00 contributions paid by the Creditors that would ultimately come due, nor did the Debtors dispute the returns, fees, or attorneys fees due to the Creditors. *See generally id.*, **Exhibit B** The only affirmative defense that the Debtors advanced was that $10,000,000.00[3] was paid to Dr. Lalit Patel, one of the Creditors, which should have been distributed to the Creditors. *See id.* at 8-9. This is being disputed in the Litigation, but even accepting that as true for arguments sake only, the Creditors are still due $25,837,500.00.

On November 21, 2025, the Debtors filed an Answer and Affirmative Defenses to Plaintiffs' Verified Complaint, Counterclaim, and Third-Party Complaint to the Creditors (the "Answer"). Moving Brief, **Exhibit E.** Notably, the Answer did not because it could not deny that "[the Debtors] guaranteed for the benefit of [the Creditors] the complete and timely repayment of certain preferred returns and capital redemption in connection with [Creditors'] $26,000,000 capital contributions."

---

[3] Remarkably, the purported $10,000,000.00 paid by Creditors does not match with the amount due of $9,987,500.00 invalidating the credibility of the Debtors' allegations. Further, Dr. Lalit Patel has certified that the $10,000,000.00 was for an entirely independent real estate investment.

*See* Moving Brief, **Exhibit B** ⁋ 9 and **Exhibit E** ⁋ 9. Additionally, the Debtors could not deny that with respect to the Liberty LLC, the Creditors were owed preferred returns in the amount of 1.25% per month and a deadline for redemption of August 2025. *Id.,* **Exhibit B** ⁋⁋ 14-15 and **Exhibit E** ⁋⁋ 14-15. The Debtors could not deny that with respect to the Riverside LLC the Creditors were owed 18% in preferred returns annually and that the deadline for redemption was March 8, 2024. *Id.,* **Exhibit B** ⁋⁋ 29-31 and **Exhibit E** ⁋⁋ 29-31. Likewise, the Debtors could not deny that with respect to the Wood LLC the Creditors were owed 1.25% per month in returns, nor that the redemption deadline was January 30, 2025. *Id.,* **Exhibit B** ⁋⁋ 45-46 and **Exhibit E** ⁋⁋ 45-46. Significantly, the Debtors' Counterclaim and Third-Party Complaint concedes that the preferred returns prescribed by the Operating Agreements and amendments were "guaranteed by the Pragers individually." *Id.,* **Exhibit E** ⁋ 20. Additionally, the Counterclaim and Third-Party Complaint does not so much as allege that any distributions were made by the Debtors to the Creditors aside from the purported $10,000,000.00 that was paid to Dr. Patel that ***Debtors are demanding be returned to them.*** *Id.* ⁋⁋ 1-49 ("the Pragers seek the return of the $10,000,000 wrongfully misappropriated by [Dr. Patel and his entities]"). Further, the Creditors concede that "[i]n late 2023, the Investment Properties experienced a cash shortfall…" *Id.* ⁋ 22.

On December 24, 2025, the Creditors filed a First Amended Verified Complaint adding Yaakov Prager as an additional guarantor to the Liberty LLC, and the Olive 2021 South Dakota NCNG Trust as well as the Olive 2021 South Dakota ING Trust (collectively, the "Trusts") as members of the Liberty LLC and Riverside LLC respectively. *See generally* Moving Brief, **Exhibit C.** Additionally, the Creditors added Dr. Lalit Patel as a Defendant due to allegations made by the Creditors discussed *supra. Id.* The First Amended Verified Complaint supplemented the Creditors' causes of action for enforcement of the guarantees with Counts 1 through 9 sounding in breach of

contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment – all tailored towards the same theory of recovering the preferred returns due to the Creditors under the Operating Agreements and corresponding amendments. *Id.*

On April 10, 2026, the Creditors along with the Trusts filed a Motion to Dismiss Counts 1 through 9 -- the claims of which did not involve the enforcement of the guarantees --of the Amended Verified Complaint culminating in oral argument on April 10, 2026. *See* Moving Brief at **Exhibit F,** Supplemental Certification of Jason R. Finkelstein, Esq. ("Finkelstein Cert."), **Exhibit F.** Significantly during oral argument, the Creditor's litigation counsel outright stated that "[t]he companies were failed investments for everybody involved. They're completely underwater. It's a lost investment for everyone." *Id.* at 17:14-19. Ultimately, the trial court denied the Creditor's Motion to Dismiss.[4] *See* D'Artiglio Decl. **Exhibit C.** Notably, the Petitions only seek relief pursuant to the guarantees, that are encompassed in Count 10 through 12.

To date, the Creditors have not received any payments since November 2023 with respect to the Riverside LLC and Wood LLC, at which time Creditors admitted there was a "cash shortfall," and since January 2024 with respect to the Liberty LLC. Moving Brief, **Exhibit E** ⁋ 22. Declaration of Rupan Trikha ("Trikha Decl") ⁋⁋ 2, 3. The total amount due to the Creditors accounting for preferred returns and the redemption amount totals $35,837,500.00 as of April 1, 2026. *See* Trikha Decl. ⁋ 6. This was despite numerous demands for payment and default notices. *See* Moving Brief, **Exhibit C** ⁋⁋ 67-75. Even more alarming, the Creditors' attorney unequivocally stated that all three projects subject to the Operating Agreements are underwater. *See* Moving Brief at **Exhibit F,** Finkelstein Cert., **Exhibit F** at 17:14-19**.** Substantiating the Creditors' purported insolvency is news articles reporting defaults on behalf of the Creditors for amount spanning from

[4] While Creditors' litigation counsel did request reconsideration of the Motion to Dismiss denial, the order is not subject to a formal reconsideration application and stands.

$9 million to $40 million, pending litigation with similar circumstances and judgments against Debtors. *See* Trikha Decl., **Exhibits C-I;** D'Artiglio Decl., **Exhibits D-G.**

## III. Involuntary Petition.

On April 28, 2026, the Debtors filed Involuntary Petitions against Avrohom and Shulamit – the guarantors of the Operating Agreements. ECF Doc. No. 1; ECF Doc. No. 1. This filing came after the Debtors' counsel stated that the subject real estate investment projects were "completely underwater." *See* Moving Brief at **Exhibit F,** Finkelstein Cert., **Exhibit F** at 17:14-19. Debtors' counsel's statements were substantiated by the numerous judgments against the Debtors and creditors that have noticed their appearance in this matter along with those who have not made formal appearances in this matter, but who have judgments against the Debtors. *See* D'Artiglio Decl., **Exhibits D-G;** *see also* D'Artiglio Decl. ⁋ 9. This is in addition to the materials identified *supra* Point II. While the Litigation is pending, there has been no dispute that the Creditors have not paid amounts due to the Debtors in an amount of ***at least*** $26,000,000, even accepting all of the Debtors' assertions with respect to the $10,000,000 payment to Dr. Patel as true for the sake of argument only.

# ARGUMENT

## I. The Court Should Grant The Involuntary Petitions.

"An involuntary case may be commenced only under chapter 7 or 11 of this title, and only against a person …" 11 U.S.C. § 303(a). An involuntary case may be commenced if (i) there are three or more creditors, (ii) "each of which is either a holder of a claim against such a person that is not contingent as to liability or the subject of bona fide dispute as to liability or amount.." and (iii) the creditors aggregately hold undisputed claims of "at least $10,000 more than the value of any lien of property of the debtor securing such claims held by the holders of such claims." 11

U.S.C. § 303(b)(1) and (2). "The involuntary petition provisions provide a remedy for creditors who seek to place the alleged debtors into bankruptcy to avoid impairment of potential assets that could satisfy the debts to the creditors." *In re Stroop,* 47 B.R. 986, 989 (Colo. Bankr. 1985).

The Creditors meet each of these statutory requirements. The Creditors exceed the number of creditors and minimum monetary threshold, which is not in dispute and thus conceded by Debtors. Moreover, there is (i) no bona fide dispute over the liability and amount due in the Petition, (ii) the Creditors have established that the Debtors are not generally paying their debts, and (iii) the Petitions were filed in good faith rendering the Petition necessarily granted.

**A. <u>The Creditors' Claims Are Not The Subject Of A Bona Fide Dispute.</u>**

In *B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Centers, Inc.* the Third Circuit, examined different tests to determine whether a bona fide legal dispute of liability or amount is described in various ways including "a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side." 865 F.2d 65, 66 (3d. Cir. 1989) (citing *In re Jonston Hawks, Ltd.,* 49 B.R. 823 (Bky. Dist. of Hi. 1985)). Other definitions of "bona fide dispute" in which the Third Circuit examined included a summary judgment standard, and "if there is a genuine issue of a material fact ***that bears upon the debtor's liability***, or a meritorious contention as to the application of law to undisputed facts…" *Id.* (citing *In re Stroop*, 51 S.B.R. 210 (D. Colo. 1985), *In re Lough*, 57 B.R. 993 (Bky. E.D. Mich. 1986)) (emphasis added). Ultimately, the Third Circuit Court in *B.D.W.* adopted the standard of whether "there is a genuine issue of a material facts ***that bears upon the debtor's liability***, or a meritorious contention as to the application of law to undisputed facts… "***substantial*** factual and legal question[] raised by debtor…" *Id.* at 66-67 (emphasis added).

Here, there is no genuine issue of material fact that disputes the liability nor the amount owed to the Creditors. At worst, this is potentially dispute over $10,000,000.00 in a $36,000,000.00 claim, necessarily conceding Creditors are owed the balance. Indeed, the Debtors' Answer in the Litigation does not deny that the Creditors are due preferred returns and capital redemption with respect to Creditors' $26,000,000.00 aggregate contributions, nor that the Debtors personally guaranteed these contributions deeming these allegations admitted. *See* Moving Brief, **Exhibit B** ¶¶ 9, 14-15, 29-31, 45-46 and **Exhibit E** ¶¶ 9, 14-15, 29-31, 45-46; *see* Rule 4:5-5 ("Allegations in a pleading which sets forth a claim for relief, other than those as to the amount of damages, are admitted if not denied in the answer thereto"). By virtue of the personal guarantees executed by both Avrohom and Shulamit in connection with the Operating Agreements, the Debtors are inarguably liable for amounts not paid to the Creditors. Notably missing from any of the Debtors' pleadings in the Litigation, arguments in their opposition to the SJ Motion, or even in the subject Motion is any dispute that the Debtors have not paid the Creditors in full.

In fact, ***the only dispute*** is as to the $10,000,000.00, which the Debtors alleged were paid to Dr. Patel for Creditors benefit (there is no dispute Creditors did not receive those alleged funds). Thus, while the Debtors maintain that they are owed $35,837,500.00, at the absolute minimum they are owed $16,000,000.00 even if the $10,000,000 in dispute is deducted and if the Debtors dispute the preferred return calculations -- which they do not. Courts within this Circuit have explicitly permitted undisputed portions of a debt to support an involuntary petition when there are disputes as to other portions of the asserted amount. *IBM Credit Corp. v. Compuhouse Sys.*, 179 B.R. 474, 479 (W.D. Pa. 1995) ("[I]f at least a portion of the debt that is the subject of the petition is undisputed, the undisputed portion is sufficient to create a debt under Section 303(b)(1) not subject

to a bona fide dispute.") Accordingly, there is no bona fide dispute as to ***at least*** $16,000,000.00 even accepting all arguments by the Debtors as true for the sake of argument only.

The Debtors' contentions that a bona fide dispute exists are legally and factually deficient, and must be given short shrift. As an initial matter, the Debtors incorrectly enlist the standard for a bona fide dispute set out in *In re TPG Troy*, a Second Circuit case. *See* Moving Brief at 11-12; 793 F.3d 228, 234 (2d. Cir. 2015). While the *In re TPG Troy* provides a more favorable standard for Debtors, which is no doubt the reason it was utilized, it cannot trump binding Third Circuit precedent. *See B.D.W. Assoc., Inc.*, 865 F.2d at 66.

First, it is well settled that pending litigation does not on its own establish a bona fide dispute. *IBM Credit Corp.,* 179 B.R. at 479 ("many bankruptcy courts have held that the mere existence of a counterclaim is insufficient to create a bona fide dispute"). This principle is confirmed by the *Crest One SpA v. TPG Troy* decision that is oft cited by ***Debtors.*** 793 F.3d at 234 ("It is true that the mere existence of pending litigation, here litigation relating to Troy's liability on the Notes, or the filing of an answer is insufficient to establish the existence of a bona fide dispute"). Indeed, the circumstances in the *TPG Troy* matter where it was found that there was a bona fide dispute because the alleged debtor "'vigorously' dispute[d] the factual underpinnings of the Petitioners' alter ego claims" is a far cry from the case at bar where there is no dispute as to the liability of the Debtors, that an amount certain is due to Creditors, and that the vast majority of amounts due were not paid. *Id.* Moreover, the court in *IBM Credit Corp.,* a court within the Third Circuit, found allegations in a counterclaim insufficient to create a bona fide dispute.[5] 179 B.R. at 480-81. This is especially true in this instance where the Debtors do not dispute the material facts giving rise to the subject involuntary bankruptcy.

---

[5] Debtors' Counterclaim, notably, is not filed against Creditors.

Second, the Debtors' insistence on production of the underlying agreements is remarkably disingenuous considering that the Debtors' own Answer included in the Motion reference these documents and their terms. *See* Moving Brief, **Exhibit E** ⁋⁋ 18-20. Further, Debtors attach a certification from their Litigation counsel explicitly detailing these very documents with representations that each document was produced ***by the Debtors***. Moving Brief at **Exhibit F,** Finkelstein Cert. ⁋ 4. Notwithstanding, the amendments to the Operating Agreements setting forth the terms of the returns and redemptions are included herein. *See* Trikha Decl., **Exhibits A-C.** They are clear on their face: Debtors guaranteed the payments which are now past due and indisputably not paid in full.

Third, Creditors detail at length above that while they are claiming $35,837,500.00 pursuant to the undisputed terms in the Operating Agreements and corresponding amendments, there is no dispute that the Creditors are owed ***at least*** $16,000,000.00 even accepting all of Debtors' arguments as true (which they are not). Thus, there is no bona fide dispute as an eight figure debt, far in excess of the amount required to institute an involuntary petition,

Fourth, it is well settled that settlement negotiations cannot be used for evidentiary purposes such as Creditors attempt here. *See* F.R.E. 408 ("conduct of a statement made during compromise negotiations about the claim" is inadmissible evidence). Indeed, the content of those settlement discussions actually included concessions by Debtors' counsel that the Debtors owed the amounts set forth in this involuntary bankruptcy. *See* D'Artiglio Decl. ⁋ 10 ("During mediation on March 13, 2026, the Debtors offered a Consent Judgment for the full amount wed to the creditors")."). We ordinarily would never put the details of settlement negotiations before the Court but, because Debtors attempted to use these negotiations as a sword against Creditors,

Creditors are constrained to correct this disingenuous narrative.[6] In any event, such communications cannot be utilized by Debtors and should be disregarded without any consideration by the Court.

In light of the above, there is no dispute whatsoever as to ***at least $16,000,000.00*** of the Creditors' claims, and certainly no bona fide dispute as to liability which would render the Creditors' unable to sustain an involuntary petition.

**B. Significant Evidence Demonstrates That The Debtors Are Generally Not Paying Their Debts.**

"[A]fter trial, the court shall order relief against the debtor in an involuntary case … only if … the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount…" 11 U.S.C. 303(h). "The burden is on the petitioning creditors to establish by a preponderance of the evidence that the debtor was generally not paying its debts as they became due as of the petitioning date." *In re VitaminSpice,* 472 B.R. 282, 297 (E.D. Pa. Bankr. 2012) "Courts considering whether a debtor is generally not paying its debts consider several factors including the number of debts, the amount of delinquency, the materiality of nonpayment and the nature of the debtor's conduct of its financial affairs." *Id.* at 297 (Found that petitioner did not meet its burden because "[t]he only evidence submitted to this Court relating to whether VitaminSpice is generally not paying its debts as they become due related to whether VitaminSpice has failed to pay the specific debts relied on by petitioning creditors"). "Courts should look to the totality of the circumstances existing when

[6] The position is illogical in any event. For instance, banks regularly negotiate workouts, forbearances, etc. with defaulting borrowers, notwithstanding loan documents are generally clear on their face and there are no legitimate defenses. They do so for a panoply of reasons, such as delay in securing a judgment, collectability concerns, desire to avoid litigation (even if virtually guaranteed to be successful), or a host of other reasons, none of which indicates that a bank would concede its loan documents or rights to collect on an unpaid loan are somehow subject to a bona fide dispute merely because the bank explored amicable resolutions.

the perition was filed." *In re Food Gallery*, 222 B.R. 480, 487 (W.D. Pa. 1998) (citing *In re H.I.J.R. Properties Denver*, 115 B.R. 275, 277 (D. Colo. 1990)).

As an initial matter, the inadvertent mistake wherein the petition was missing a check mark in a box should not be used as a reason to dismiss the Petitions, especially in light of the voluminous evidence demonstrating that the Debtors generally are failing to pay their debts. *See Tribune Media Co. v. Aurelius Capital Mgmt., L.P.*, 799 F.3d 272, 287 (3d. Cir. 2015) ("bankruptcy courts are courts of equity and apply the principles and rules of equity jurisprudence"). In addition to the undisputed debt owed to the Creditors in excess of $35,000,000, Creditors have located four judgments by way of writs of execution (consent or otherwise) having been entered against Avrohom, Shulamit or both Debtors together amounting to a ***principal amount alone*** in excess of $135,000,000.00. *See* D'Artiglio Decl., **Exhibits D-G.** Moreover, Creditor's counsel has been made of aware of other judgments owed to creditors exceeding $150,000,000.00. *See* D'Artiglio Decl. ⁋ 9. This is putting aside the articles being written about the Debtors' prodigious debts that are so noteworthy that they have attracted the focus of news outlets. *See* Trikha Decl. ⁋⁋ 7-18**.** Accordingly, the Creditors easily meet their standard of showing that the Debtors generally have not paid their debts by a preponderance of evidence by way of undisputable evidence demonstrating not only numerous creditors of the Debtors but debts aggregately exceeding ***nine figures.***

In the remarkable event that this Court is not persuaded by the voluminous aforementioned evidence, it is respectfully requested that Creditors be permitted to engage in limited discovery to determine the extent of Debtors' failure to pay their debts. Such discovery is permitted by § 303(h), which suggests that further proceedings including a trial can occur if an involuntary petition is contested. *In re Apollo Health St., Inc.*, 2011 Bankr. LEXIS 1838, *15 (NJ Bankr, May

18, 2011) (The court held that holding two days of testimony after a motion to dismiss is "keeping with the Code…"); *see also In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328, 332 (3d. Cir. 2015) (The bankruptcy court held an evidentiary hearing after a motion to dismiss was filed).

[*Remainder of page intentionally left blank*]

**C. The Involuntary Petitions Should Not Be Dismissed As They Are Necessitated By Law And Fact.**

Debtors continued bad acts cannot be countenanced warranting this Court's denial of the instant motion to dismiss. The Creditors filed the Petitions due to the numerous creditors accrued by the Debtors that evidencing a massive debt load. As such, the Petitions seek to maintain the enormous debt accrued by the Debtors in a central repository -- the very purpose of an involuntary bankruptcy. *In re Stroop,* 47 B.R. at 989 ("The involuntary petition provisions provide a remedy for creditors who seek to place the alleged debtors into bankruptcy to avoid impairment of potential assets that could satisfy the debts to the creditors"). Additionally, the Creditors lawfully exercised their rights under the Bankruptcy Code in an effort to collect debts due and owing from Debtors in a sum no less than $35,837,500.00.

The good faith filing of the Petitions and failure of the Debtors to show ***any*** bad faith, much less using a "totality of the circumstances" standard adopted by the Third Circuit, renders the Debtors' "bad faith" argument dead on arrival. Additionally, the remainder of Debtors' arguments that consulted non-binding standards -- "improper purpose" test, "improper use" test, the "objective use" test, and the "Rule 9011" also fail confirming the deficiency in Debtors' bad-faith argument. It is axiomatic that the Debtors must be foreclosed from seeking attorneys' fees and costs pursuant to 11 U.S.C. § 303(i).

**i. The Third Circuit's Totality Of The Circumstances Test Prove The Involuntary Petitions Were Filed In Good Faith.**

This Court in *In re Forever Green Ath. Fields, Inc.* crafted a fact sensitive test to ascertain whether creditors who have filed involuntary petitions have done so in bad faith. 804 F.3d 328 (3d Cir. 2015). The Court confirmed: "Time and again, we have emphasized that 'good faith' filing requirements have 'strong roots in equity.'" *Id.* at 334. (citing *In re SGL Carbon*, 200 F.3d 154,

161 (3d Cir. 1999)); *see also In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000). While an involuntary petition may be a powerful tool, Bankruptcy Courts are clothed with the authority to "[p]atrol the border between good-and bad-faith filings." *Id.* (citing *In re SGL Carbon*, 200 F.3d at 161; *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (explaining that the "good faith" requirement protects the "integrity of the bankruptcy courts by rendering their powerful equitable weapons…available only to those debtors and creditors with 'clean hands'")). When analyzing whether a petition was filed in good faith, "[c]reditors are presumed to have acted in good faith." *Id.* (citing *In re Bayshore Wire Prods.*, 209 F.3d 100, 105 (2d Cir. 2000)). For a debtor to be successful in dismissing an involuntary petition, the debtor must show by a preponderance of the evidence that the creditors acted in bad faith. *Id.* (citing *In re Petralex Stainless Ltd.*, 78 B.R. 738, 743 (Bankr. E.D. Pa. 1987)).

Specifically, the Third Circuit (where the Petitions are pending) adopted the "totality of circumstances" standard for determining bad faith pursuant to 11 U.S.C. § 303. As such, Debtors' reference to and analysis of bad faith under the "improper purpose" test, "improper use" test, the "objective use" test, and the "Rule 9011" test are blatant attempts by Debtors to muddy the waters without merit as the totality of the circumstances test makes clear the Involuntary Petitions were properly filed.

While the standard for evaluating bad faith is not defined in the Bankruptcy Code, the Third Circuit Court in *In re Forever Green Ath. Fields, Inc*. held that "courts have applied a 'dizzying array of standards' mostly analyzing the post-dismissal motions for damage per 11 U.S.C. § 303(i)(2)." *See In re Forever Green Ath. Fields, Inc.*, 804 F.3d at 335. The Third Circuit adopted the broad totality of the circumstances test that looks at both subjective and objective evidences of bad faith. *Id.* This analysis is the same standard that courts apply when evaluating whether a

debtor's voluntary petition was filed in bad faith. *Id.* (citing *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996)). The plethora of factors courts must consider as it relates to the fact-intensive review are including but not limited to:

> whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing. *See In re Forever Green Ath. Fields, Inc.*, 804 F.3d at 336.

Here, it is abundantly clear that Creditors meet most (if not all) of the aforementioned factors to support a finding of good faith. First, the Creditors have satisfied the statutory criteria for filing the involuntary petitions. Indeed, the Creditors have shown that there is no bona fide dispute as to liability nor amount, and that Debtors have generally not paid their debts -- the only disputed statutory elements -- as addressed at length *supra* Point I-II.

Second, the Petitions are meritorious in nature. Creditors are owed funds under the clear language of the Operating Agreements and corresponding guarantees. *See* Trikha Decl., **Exhibits A-C.** This has not been disputed at any stage in the Litigation, nor in the Motion confirming its merit. More specifically, the Creditors have not received any returns nor redemption of their investment made in the Liberty LLC since January 2024 with payments continuing to accrue as the days go on, including attorneys' fees and costs in connection with same. *Id.* ⁋ 4. Similarly, the Creditors' have not received returns nor redemption on their investments with respect to the Riverside LLC nor Wood LLC since November 2023 with payments continuing to accrue as each day passes, including the attorneys' fees and costs associated with this preferred capital

contribution. *Id.* ⁋ 5. As such, the Involuntary Petitions were filed with a meritorious purpose weighing against a finding of bad faith on the Creditors'.

Third, Creditors made more than a reasonable and diligent inquiry prior to filing the Involuntary Petitions. In particular, the Creditors located four judgments entered against Creditors, found articles illustrating an enormous amount of debt accrued by the Debtors, and were told unequivocally by Debtor's litigation counsel, both on the record and off the record, that the investments were "under water." *See* Moving Brief at **Exhibit F,** Finkelstein Cert., **Exhibit F** at 17:14-19; Trikha Decl., **Exhibits C-I;** D'Artiglio Decl, ⁋ 9 and **Exhibits D-G.** Notably, the four judgments ascertained by the Debtors, included New Jersey judgments in the principle amount of $2,479,766.81, $69,952,453.61, $38,694,001.49 and $27,957,304.56. *See* D'Artiglio Decl., **Exhibits D-G.**

Fourth, as indicated herein, and throughout the pendency of the Litigation, Creditors suspect that assets are likely being hidden and transferred -- namely by the existence of two trusts in North Dakota, the Olive 2021 South Dakota NCNG Trust as well as the Olive 2021 South Dakota ING Trust (collectively, the "Trusts") in an effort to hide assets from not only the Creditors here, but others with significantly higher debts than that of the Creditors. *See generally* Moving Brief, **Exhibit C.** Confirming this belief are the aforementioned judgments for which the Creditors located writs of execution making it readily apparent that the substantial sums have not been collected upon to date. *See* D'Artiglio Decl., **Exhibits D-G.**

Fifth, a review of the transaction history between the parties and the Litigation would reveal that Creditors did not file the Petitions as a means to harass the Debtors or in an attempt to cast ill-will upon them. Rather, Creditors – who are owed more than $35,000,000.00 by the Debtors -- are attempting to collect upon sums due and owing especially in light of the numerous other

creditors who are owed substantial sums. The timing of the Petitions – two weeks after on-the-record representations by Debtors counsel that the investments were part of a failed real estate project -- are transparently a good-faith attempt to recover funds from investment entities that Debtors outright stated were under water. *See* Moving Brief at **Exhibit F,** Finkelstein Cert., **Exhibit F** at 17:14-19. Indeed, Creditors are concerned that further delay would allow other creditors with seven, eight, and nine figure judgments to potentially collect any assets available from Debtors while leaving Creditors without recourse.

Sixth, Creditors did not file the Petitions as a means to secure an advantage over other creditors. Indeed, while Creditors are owed well over $35,000,000.00, there are other creditors owed larger sums of money as a result of other debts. *See e.g.* D'Artiglio Decl., **Exhibits D-G**; Trikha Decl., **Exhibits C-I.** As such, based upon information and belief, sums amounting to ***hundreds of millions of dollars*** are due and owing as a result of Debtors failure to pay various creditors, not just Creditors in the matter at bar. Creditors seek to have all creditors of the Debtors stand on equal footing in one forum rather than races to courthouses across the country to determine which creditors can extract any sums from Debtors first.

Seventh, Creditors did not use the filing of Involuntary Petitions as a tactical litigation advantage weighing against the finding of bad faith as grounds for dismissal. As stated above, the Petitions were only filed after it became painfully apparent that the investment projects subject to the Operating Agreements were insolvent. Rather, the filing of Involuntary Petitions were necessitated by Debtors' repeated failure to abide by the terms of the agreements. Indeed, the Court has indicated that the underlying litigation will be ***stayed*** if the Petitions are granted. While Creditors would prefer to move as expeditiously as possible towards a judgment, the importance of ensuring that Debtors' substantial liabilities are administered in one forum for the benefit of all

unsecured creditors equally outweighed the delay in the underlying litigation which ***only serves to prejudice Creditors***.

Eighth, the Petitions were not used as an alternative to debt collection procedures weighing against a finding of bad faith. Creditors provided Debtors numerous opportunities to cure their debts. In fact, Creditors attempted more than ***six times*** to collect funds due and owing prior to instituting the Litigation or filing the Petitions. *See* Moving Brief, **Exhibit C** ⁋⁋ 67-76. These attempts spanned six demand letters over the course of February 6, 2024 through June 18, 2024 none of which resulted in satisfaction of Creditors obligations.

More recently, as pointed out by Creditors, the parties engaged in settlement discussions showing that Creditors exhausted all avenues up to and through April 2026. D'Artiglio Decl. ⁋ 10. Furthermore, Creditors affirmatively identify for the Court a host of other liabilities of the Debtors demonstrating that Creditors do not seek to use bankruptcy as their personal collection tool, but a fair and equitable forum for all creditors to pursue their claims against Debtors in one forum, on equal footing. As such, based on the longstanding and continued history wherein Creditors gave Debtors a plethora of opportunities to cure defaults to no avail, it cannot be said that Creditors used the Petitions as a debt collection substitute. Rather, this factor along with others weighs against a finding of bad faith.

Ninth, the filing does not have 'suspicious timing' to support a bad faith filing. Alternatively, the timing demonstrates Creditors good-faith basis in filing the Petitions. As discussed previously, the Petitions were only filed after Debtors' Litigation counsel stated on the record that the entities subject to the Operating Agreements were insolvent.

For the foregoing reasons, based upon the "totality of the circumstances" test set forth by the Third Circuit, it is abundantly clear the Involuntary Petitions do not amount to bad faith filings.

As such, without the filings amounting to bad faith, Debtors' request for dismissal or fees and costs in accordance with 11 U.S.C. § 303(i) must be denied because fees and costs are only appropriate if a Court were to find the petition was improper. Additionally, Debtors' demand for punitive damages must be denied since the Involuntary Petitions were not filed in bad faith. "The imposition of punitive damages, unlike fees and costs, ***must be*** predicated upon a finding of bad faith, as the plain language of Code section 303(i)(2)(B) states." *In re Silverman*, 230 B.R. 46, 51 (Bankr. D.N.J 1998). (emphasis added). (citing *In re Advance Press & Litho, Inc*., 46 B.R. 700, 701 (Bankr. D. Col. 1984)); *see also Tarasi & Tighe*, 88 B.R. 706, 712 (Bankr. W.D. Pa. 1988). Because the Involuntary Petitions were not filed for an improper purpose there are no damages as a result of same warranting denial of Debtors' request for attorneys' fees and costs, compensatory damages, or punitive damages.

**ii. The "Improper Use" Test, The "Improper Purpose" Test, The "Objective Test," And The "Rule 9011" Test Do Not Apply Warranting Denial Of The Motion To Dismiss.**

In contravention of the "totality of circumstances" test utilized by the Third Circuit, Debtors allege that the Involuntary Petitions meet the "improper use" test, "improper purpose" test, the "objective test," and the "Rule 9011" test warranting dismissal on the grounds of bad faith. However, such an argument is of no moment. Debtors' analyses under each of the aforementioned tests do not amount to bad faith, rather, Debtors cast aspersions on the Creditors' Involuntary Petitions to deflect from their own bad acts.

**a. Improper Purpose Test**

Debtors incorrectly allege that the Involuntary Petitions were filed by Creditors for the "improper purpose" of coercing settlement in the Litigation and "detonating bad-boy guaranty provisions" contained with the personal guarantees executed by the Debtors. However, such

allegations are without support in law or fact. "The improper purpose test questions the petitioning creditor's reason for filing the involuntary petition, focusing particularly on whether the petitioner sought to destroy the alleged debtor." *In re Silverman*, 230 B.R. 46 at f.n. 2. *See, e.g., In re Salmon*, 128 B.R. 313, 315 (Bankr. M.D. Fla. 1991) (bad faith found based on petitioning creditor's motive to force alleged debtor out of business). Here, Creditors did not file the Involuntary Petitions in an attempt to 'destroy' Debtors, rather, Creditors are simply attempting to recover debt in the amount of $35,000,000.00 and to create a central repository for the numerous and significant debts accrued by Debtors to ensure that the first creditor to the courthouse does not disproportionately benefit in collecting any assets available to satisfy all creditors. Further, Debtors' own actions (and inactions) caused any purported "damages" incurred as Debtors defaulted on their payment obligations and the personal guarantees executed by Debtors. Creditors gave Debtors more than ample notice to cure said defaults prior to filing the Litigation, and, at any time Debtors could have paid said sums due and owing. Accordingly, Debtors' analysis that the Petitions were filed in bad faith in accordance with the "improper purpose" test fails, and, it reasonably follows if the Involuntary Petitions were not filed in bad faith, Debtors cannot recuperate fees and costs nor recover punitive damages per 11 U.S.C. § 303(i).

**b. <u>Improper Use Test</u>**

Debtors alleged the Involuntary Petitions meet the "improper use" test because Creditors are attempting to use the petitions as debt collection devices when Creditors have an adequate remedy in the Litigation. However, such an argument is without merit. "The improper use test questions whether the petitioning creditor used the involuntary bankruptcy process to obtain an improper advantage over other creditors rather than pursuing collection in the appropriate non-bankruptcy forum." *In re Silverman*, 230 B.R. 46, f.n. 2 (Bankr. D.N.J. 1998) (citing *In re Johnston*

*Hawks, Ltd.*, 72 B.R. at 367-68 (Bankr. D. Haw. 1987)); *In re Better Care, Ltd.*, 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989); *Basin Electric Power Cooperative v. Midwest Processing Company (In re Basin Electric),* 769 F.2d 483, 487 (8th Cir. 1985). Here, while Creditors are owed well over $35 million dollars, Debtors have far larger creditors than those included herein. As stated *supra*, the Creditors provided Debtors with every opportunity to cure the many defaults prior to filing the Litigation, sending as many as ***six notices*** prior to instituting the Litigation. However, as each day passes, Creditors fear either Debtors assets will be seized by another creditor owed a substnaial debt reduced to judgment or Debtors will attempt to siphon funds and assets out of their individual names to prevent collection of the debts due and owing. As such, because the Petition does not provide a unilateral advantage to Creditors (indeed, it is contemplated specifically to provide an orderly process for all creditors), and does not act as a debt collection device, Debtors' arguments as it relates to the "improper use" test fails, further supporting the Creditors' notion that the Involuntary Petitions were filed for a good faith bankruptcy purpose.

**c. <u>Objective Test and 9011 Test</u>**

Further, Debtors incorrectly assert the Involuntary Petitions were filed in bad faith under the "objective test" and the "9011 test." There is a line of case law wherein the Court examines the filing of an involuntary petition on the basis of the 'objective test' for bad faith based on "what a reasonable person would have believed." *In re Bayshore Wire Prods.*, 209 F.3d 100, 105 (2d Cir. 2000) (citing *Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.),* 61 B.R. 614, 620 (B.A.P. 9th Cir. 1986)). The Court in *In re Wavelength, Inc.*, stated that whether a party acted in bad faith is an issue of fact. *Id.* Here, a reasonable person would conclude the Involuntary Petitions were not filed in bad faith but rather, they were necessary as the debts due and owing continue to accrue without any prospect of repayment. Rather, it appeared as if Debtors were attempting to repay

other individuals such as Dr. Patel (and possibly move assets to the Trusts) in an effort to prevent repayment to Creditors. Indeed, for many members of Creditors' group, the investments represent their life savings or retirement funds, and Creditors are understandably concerned that their only hope of a recovery is to bring all creditors into one forum before even more substantial judgments are satisfied with whatever remaining assets Debtors may have, leaving Creditors with no prospect of receiving any recovery.

The 9011 Test is another means to determine a bad faith inquiry under Bankruptcy Rule 9011. However, application to the matter at bar is inapposite. The Eleventh Circuit opined:

> An analysis under Rule 9011 inquires into 'a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law.' In addition to requiring an objective inquiry, Rule 9011 requires a subjective inquiry as well: the bankruptcy proceeding cannot have been interposed for an improper purpose, 'such as to harass, to cause delay, or to increase the cost of litigation.' *In re Bayshore Wire Prods.*, 209 F.3d 100, 106 (2d Cir. 2000) (citing *General Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-1502 (11th Cir. 1997)).

In the matter at bar, it is evident that the Involuntary Petitions were not filed for an improper purpose and were not filed to harass the Debtors. The Court *In re Navient Sols., LLC,* stated there are both objective and subjective elements of the test, however, the objective portion of the test includes a requirement that the party conducted "a reasonable inquiry into the facts and the law" "bearing on the legal justification of a claim." *In re Navient Sols., LLC*, 2022 U.S. Dist. LEXIS 52583 at *25 (Bankr. S.D.N.Y. 2022). Debtors' allegation that Creditors failed to inquire into the relevant facts and pertinent law prior to filing and is 'conclusively shown' for many reasons is without merit. Debtors allege no operating agreement, promissory note, judgment, written guaranty etc. were filed with the Involuntary Petitions. However, that information is submitted herewith and was not required to be submitted with the Involuntary Petitions. *See* Trikha Decl.,

**Exhibits A-C.** Debtors are also incorrect that failing to check a box on Form 105 means Creditors did not inquire into the relevant facts and pertinent law. Rather, this was a clerical error in uploading the Petitions that holds no substantive weight in the face of voluminous evidence presented herein and referenced at length *supra* that demonstrates Debtors not paying their debts as they come due -- to the tune of hundreds of millions of dollars. Further, Debtors' assertion that Shulamit is simply a housewife and should not be included in the Involuntary Petition is without merit as she personally guaranteed the loans at issue and owes funds to Creditors. *See* Trikha Decl., **Exhibits A-C.** In fact, there is no other reason that Shulamit was joined in the Petition other than she was a personal guarantor of the Operating Agreements. Creditors cannot respond to Debtors reference to $108 million in 'returns' as Creditors seek $35 million from the Involutory Petitions, because it does not refer to any facts in this case and must be readily dispensed. *See* Moving Brief at 17.

**d. Debtors Created Their Own Harm And The Involuntary Petition <u>Against Shulamit Is Appropriate</u>.**

Debtors baldly assert that the Creditors filed the Petitions with knowledge of foreseeable harm bearing immediate impact on the Debtors. Debtors claim that Creditors filed the Petitions in an attempt to cast harm with everlasting impact (while ignoring the harm they face from hundreds of millions of dollars of judgments currently entered against them personally). Yet, Debtors created these issues for themselves by failing to pay debts as they became due. Indeed, ***Creditors*** cannot be blamed for ***Debtors*** massive debt spanning from the $35,000,000.00 at issue here to the other judgments exceeding $150,000,000.00. *See* D'Artiglio Decl., **Exhibit D-G.** Additionally, the assumption that the Creditors know the terms of the Debtors other investment agreements is a presumptuous and enormous logical leap that does not hold water. The argument that this Petition was brought to trigger those unknown provisions in other agreements unrelated to Creditors is

outright unbelievable especially when the simpler and actual reason for filing the Petition is an attempt to recover over $35,000,000.00 owed to the Creditors pursuant to personal guarantees before substantial, other judgments siphon away any of Debtors' available assets.

Debtors' allegation that the Involuntary Petition against Shulamit is improper is unfounded. While Debtors may seek to paint Shulamit as a housewife with no involvement as it relates to the real estate portfolio, the reality is, whether true or not, Shulamit executed personal guarantees as it related to the real estate transactions by and between the parties. *See* Trikha Decl., **Exhibits A-C.** As such, it matters little if Shulamit is an astronaut, housewife, or professional athlete -- the fact remains that she executed the personal guarantees at issue. The Debtors' contentions with respect to Shulamit attempts to allege Shulamit's signature magically appeared on 'family documents' from time to time, when in reality, she is and has been involved in the real estate ventures by executing the personal guarantees, which is the only level of involvement that concerns the Creditors. *See contra*. Moving Brief at 18 ("Mrs. Prager is a housewife who is not involved in the day-to-day operation of any underlying ventures. While Mrs. Prager has, from time to time, signed documents alongside her husband as is customary in their family and investment arrangements, the existence of her signature on one or more family related documents does not establish … personal obligation owed by her individually…"). Alternatively, a personal obligation owed individually is ***exactly*** what an executed personal guaranty establishes.

As such, the argument that the Petition cannot be filed against Shulamit simply because she is a "house-wife" is contradicted by the plain language of her guarantees.

**e. Because The Involuntary Petitions Were Not Filed In Bad Faith Debtors Are Not Entitled To Compensatory Nor Punitive Damages.**

Debtors' contention that sanctions in the form of compensatory and punitive damages fails because the Involuntary Petitions were not an abuse of the Bankruptcy Code nor filed in bad faith.

Debtors' reference to the case *In re Landmark Distribs*. is inapposite. 189 B.R. 290, 316 (Bankr. D.N.J. 1995). In that case, the Court claims it was mindful in awarding damages as an involuntary petition amounted to a "fatal blow to a going concern through the process of an involuntary bankruptcy proceeding." *Id.* at 316. As a result of the "[g]reat deal of testimony regarding damages proximately caused by petitioners in the filing of the petition," the Court awarded damages based on the discounted cash flow valuation. *Id.* Conversely, in this matter, the Petitions were not filed in bad faith, and, there is no testimony nor proof that Debtors were damaged as a result of the Petitions. Additionally, punitive damages are inappropriate in this matter. Unlike the punitive damages awarded in *In re Landmark Distribs.* which were assessed against the petitioning party as a result of egregious bad faith, because the filing of these Involuntary Petitions does not amount to bad faith, punitive damages are unwarranted. *Id.* at 317. The *In re Landmark Distrib.* Court explained how various courts assess punitive damages to punish the wrongdoer, deter the wrongdoing from repeating misdeeds, and setting an example to others. *Id.* Accordingly, because there was no wrongdoing on the part of Creditors in filing the Involuntary Petitions, and the petitions were not filed in egregious bad faith, Debtors' request for punitive damages must be denied.

**D. Creditors Should Not be Required To Post A Bond.**

Debtors inappropriately request a bond be posted by Creditors pursuant to 11 U.S.C. § 303(e), misconstruing the statute within their brief. 11 U.S.C. § 303(e) actually states: (e) ***After notice and a hearing, and for cause***, the court may require the petitioners under this section to file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i) of this section. (emphasis added). As such, the only way posting of a bond ***could*** occur is with

notice and a hearing wherein the Court finds cause for filing a bond to indemnify debtor. The Court in *In re Apollo Health St., Inc.*, stated that 11 U.S.C. § 303(e) was enacted to:

> ... discourage frivolous petitions as well as the more dangerous spiteful petitions, based on a desire to embarrass the debtor (who may be a competitor of a petitioning creditor) or to put the debtor out of business without good cause (an involuntary petition may put a debtor out of business even if it is without foundation and is later dismissed).

2011 Bankr. LEXIS 1978 at * 5 at 4-5. (citing H.Rep. No. 95-595, 95th Cong., 1st Sess. at 323 (1977); see U.S. Code Cong. & Admin.News 1978, p. 6279; see also In re Ransome Grp. Investors I., LP, 423 B.R. 556, 558 (Bankr. M.D. Fla. 2009). "A bond can have a sobering effect in a case that is off to a shaky start and that is fraught with controversy about the bona fides of the petitioners." *In re Kidwell*, 158 B.R. 203, 218 (Bankr. E.D. Cal. 1993). However, Courts have recognized that [p]etitioning creditors in involuntary cases should not be routinely required to post a bond upon the alleged debtor's request... because the Bankruptcy Code does not impose a mandatory bond requirement." *Id.* (citing *In re Ransome Grp. Investors I, LP*, 423 B.R. at 558 (citing *In re Reed*, 11 B.R. 755, 757 (Bankr. S.D. W. Va. 1981)). As such, because there is no 'cause' requiring the posting of a bond (since the Involuntary Petitions were not filed in bad faith), and Debtors have not argued specifically how or in what amounts they would suffer harm in any event, this Court should deny Debtors' request for the posting a bond, especially because notice and a hearing regarding this matter has not been afforded to Creditors.

## CONCLUSION

For the foregoing reasons, this Court should deny Debtors' Motion to Dismiss in its entirety, grant the Petitions, and grant such other, further, and additional relief as the Court deems just and proper.

Dated: Woodland Park, New Jersey
May 28, 2026

ANSELL GRIMM & AARON, P.C.

*s/Anthony J. D'Artiglio*
Anthony J. D'Artiglio, Esq.
Brian J. Ashnault, Esq.
Nicole Benis, Esq.
365 Rifle Camp Road
Woodland Park, New Jersey 07424
(973) 247-9000 Phone
(973) 247-9199 Facsimile
adartiglio@ansell.law
bashnault@ansell.law
nbenis@ansell.law

*Attorneys for the Creditors*